PEURIFOY, RECEIVER v. FIRST NATIONAL BANK OF
BATESBURG *ET AL.*

(139 S. E., 793)

1. BANKS AND BANKING—DEPOSIT HELD SPECIAL DEPOSIT OF STATE FUNDS; HENCE DEPOSITORY BANK, AFTER INSOLVENCY OF DEPOSITING BANK, COULD NOT SET OFF ITS CLAIMS AGAINST SUCH ACCOUNT.—Evidence *held* to show that deposit made by one bank in another was a special deposit of State moneys, such that the depository bank, after insolvency of the depositing bank, was not entitled to set off against such deposit claims against insolvent bank.

2. BANKS AND BANKING—WHERE BANK'S CHECKS, PAYABLE TO ANOTHER FOR ACCOUNT OF DEPOSITOR, WERE NOT PAID UNTIL AFTER DRAWER BANK WAS CLOSED, DEPOSITOR WAS LIABLE TO RECEIVER FOR AMOUNT OF PAYMENT THEREAFTER RECEIVED; "LIQUIDATE."—Where bank, holding deposit of another bank, pursuant to directions received from it, forwarded two checks to a third bank to be placed to the credit of a depositor bank, which checks were not paid before closing of drawer bank, *held,* bank examiner, after taking possession of drawer bank, did not have authority to au-

thorize payment of such checks, and hence depositor bank receiving payment directly by examiner was liable to receiver subsequently appointed for amount of such payment; "liquidate" meaning to gather in assets, convert them into cash, and distribute them according to legal rights of interested parties.

3. BANKS AND BANKING—HOLDER OF CHECK AFTER CLOSING OF DRAWER BANK HAS NO RIGHT OF PREFERENCE.—Generally, where bank drawing check is closed before check is paid, holder of check has no right of preference over other creditors.

Before DENNIS, J., Richland, October, 1926.    Affirmed.

Action by James E. Peurifoy, receiver of the American Bank & Trust Company, against the First National Bank of Batesburg and Julian H. Scarborough, State Treasurer. From a judgment for plaintiff, favorable also to second named defendant, first named defendant alone appeals.

*Messrs. Timmerman & Graham,* for appellant, cite: *Where one of two innocent persons must suffer by the wrongful act of the third, he will be required to bear the loss who was most at fault in letting it be brought about:* 134 S. E., 255. *Power of bank to make guaranty:* 87 S. C., 387. *Such act by national bank not binding on the corporation:* 133 S. C., 202. *Accounts between the two banks should be set up and the one owing the greater amount to the other should pay difference between the two accounts:* 134 S. E., 286.

*Messrs. Crouch & Ramage,* also for appellant, cite: *Relationship of State Treasurer to Trust Company:* 7 C. J., 628-671; Boone on Bkng., Sec. 50; 17 A. S. R., 778; 40 Am. Rep., 632. *Partnership:* 26 Am. Rep., 629. *General depositor:* 3 R. C. L., 517; 37 Am. Rep., 366; 1 How., 234; 1 Wall., 166. *Money deposited, by an agent in his own name and not for his principal, belongs to the agent, as between such agent and the bank:* 37 Am. Rep., 369. *"Deposits":* 45 S. C., 563; 39 S. C., 291; 54 U. S., 13; 192 U. S., 138; 33 N. E., 1054; 3 S. C., 124; 6 Cent. Dig., 1194-95; 37 N. E., 869; 58 N. W., 172; 8 Neb., 63; 59 N. E., 836; 52 Am. Rep., 9; 88 Ga., 33; 6 Ill. App., 294; 6 S. E., 414; 84 Mo., 408; 57 L. R. A., 265; 44 Atl., 1064; 80 S.

W., 604; 65 L. R. A., 820; 23 L. R. A., 164; 57 Ga., 283; 20 S. W., 406; 39 Ind., 109; 29 S. W., 926; 11 Phila., 358; 49 Am. Rep., 632; 120 Pa. St., 476; 102 Mass., 174; 73 Fed., 23; 87 Wis., 378; 134 Mass., 453; 10 N. W., 280; 166 Ill. App., 540; 123 Pac., 352. *Bank may presume that fiduciaries and trustees are acting in good faith in checking out funds:* 64 So., 806; L. R. A., 1915-E, 309; 230 Pa., 176; 216 Mass., 304; 141 S. W., 300; 10 L. R. A. (N. S.), 706; Ann. Cas., 1913-B, .1337; 132 Pac., 545; 88 Pac., 379; 18 Idaho, 429. *Bank may apply deposits to payment of matured debt due by depositor:* 201 Fed., 522; 163 Fed., 880; L. R. A., 1915-E., 794; 124 Pac., 751; 80 S. E., 703; 30 L. R. A. (N. S.), 517; 140 A. S. R., 336; 132 Pac., 174; 6 So., 313; L. R. A., 1916-C, 767; 132 Pa., 545; 154 N. Y. S., 883; 38 Pa. S. Ct., 275; 28 L. R. A. (N. S.), 869; 7 C. J., 676; 149 Wis., 413; 53 Mich., .163. *Public deposits in name of agent have no preference over other deposits:* 7 C. J., 634; 36 Am. Rep., 157; 7 Colo. App., 256; 112 Fed., 631; 102 Mo. App., 357; 18 Pa. S. Ct., 615; 88 Wis., 58; 59 Fla., 462; Boone on Bkng., Sec. 282; Id., Sec. 79; 7 C. J., 628-30. *"General deposits":* 136 Fed., 974; 27 Fed., 344; 2 Fed. Cas., 884; Id., 515; 124 A. S. R., 65; 16 L. R. A., 516; 96 Ill., 612; 103 Ind., 562; 98 A. S. R., 365; 1 Metc. (Ky.), 415; 134 Mich., 1; 36 S. W., 967; 104 Ala., 43. *Who deposit belongs to:* 7 C. J., 639; 54 S. W., 677; 99 Pa., 239; 91 Pa., 339; 7 C. J., 675, 679, 671, 672; 1 Michie on Bkng., 612; 81 A. S. R., 186; 2 Michie on Bkng., 974, 1010; 54 S. W., 677.

*Messrs. D. W. Robinson* and *D. W. Robinson, Jr.,* for respondent, Jas. E. Peurifoy, cite: *Check not payment:* Sec. 3840, Code; Brannon on Neg. Inst. (3rd Ed.), Sec. 189. *"Liquidate":* 133 S. C., 454; 123 S. C., 7; 135 S. C., 424. *Trust for creditors generally:* 3 S. C., 165-7; 124 S. C., 386. *Equity requires that the assets of an insolvent corporation be distributed ratably among creditors:* 136 S. C.,

514; 265 U. S., 13; 242 Mass., 181; 24 A. L. R., 1150; 15
Fed. (2nd.), 586-7; 12 Fed. (2nd), 893; 15 Fed. (2nd),
175; 77 S. C., 310; 81 S. C., 255. *Preference:* Sec. 512
Code; 3 Strob. Eq., 318, 329; 126 S. C., 87; 3 S. C., 165.
*Trust relationship:* 136 S. C., 517-19; 148 U. S., 58; 2
Michie on Bkng., 1416, Sec. 165; 118 S. C., 446. *Insol-
vency:* 81 S. C., 250. *State funds identified:* 118 S. C.,
446; 60 S. C., 126; 15 Fed. (2nd), 175; Id., 586.

*Messrs. John M. Daniel* and *Cordie Page,* for respondent
State Treasurer, cite: *State deposits must be protected:*
Sec. 4, Act No. 179, Acts 1925. *Trust company here cannot
claim money in preference to the State which is its principal:*
2 Bail., 461; 3 Brev., 386; 1 Treadway Const. Rep., 436;
2 S. C., 314; 91 S. C., 22. *Receiver stands in same position
as insolvent bank:* Rich. Eq. Cas., 172; 134 S. E., 283; 125
S. C., 218; 125 S. C., 367. *State funds clearly identified
from general assets of bank:* 55 S. C., 456; 60 S. C., 122;
118 S. C., 442; 73 S. C., 393; 81 S. C., 244.

October 11, 1927.

The opinion of the Court was delivered by MR. JUSTICE
COTHRAN.

This action was instituted by the receiver of the American
Bank & Trust Company, in the administration of the affairs
of the defunct bank, to determine the respective rights and
liabilities of the several parties to the suit, growing out of
the transactions hereinafter detailed:

(1) The state treasurer contends that he is entitled to
judgment against the First National Bank of Batesburg for
$50,000, with interest at 4 per cent. per annum, from June
1, 1926; that being the amount of a deposit of the state
funds made by him with the American Bank & Trust Com-
pany, and by it deposited with the First National Bank of
Batesburg.

(2) The First National Bank of Batesburg contends that
the $50,000 deposit was made in the usual course of the

banking transactions between the two banks, and that it is entitled to offset against its lability on account thereof, a liability of $33,145.35, due to it by the American Bank & Trust Company upon a general account. (This balance is stated in the answer of the First National Bank of Batesburg to have been $25,450.76, which appears to be the correct balance.)

(3) The receiver supports the contention of the state treasurer in reference to the $50,000 deposit, and further contends that he is entitled to judgment against the First National Bank of Batesburg for $17,500, with interest at 7 per cent. per annum from June, 1926; that being the sum of two drafts or checks drawn by the American Bank & Trust Company upon the American National Bank of Richmond, and directed to be placed to the credit of the First National Bank of Batesburg, but which transaction had not been consummated until after the bank examiner closed the American Bank & Trust Company, and at his direction.

(4) The American Bank & Trust Company also claims a balance of $621.07 upon what is called a "special account." As to this claim there is no controversy.

Hereafter, for convenience, we will refer to the American Bank & Trust Company, as the Columbia bank, and to the First National Bank of Batesburg as the Batesburg bank.

The case was heard by his Honor, Judge Dennis, upon testimony and evidence submitted in open Court, and he filed a decree "on or about" November 17, 1926, in which he held with the state treasurer that the $50,000 deposit was state funds, that the Batesburg bank was not entitled to offset against it the balance due by the Columbia bank to it, and that the state treasurer was entitled to judgment against the Batesburg bank for $50,000, with 4 per cent. interest from June 1, 1926. He also held with the receiver that the payment of the two drafts or checks by the Richmond bank to the Batesburg bank, authorized by the bank examiner, was made after the failure of the Columbia bank, while it

was insolvent, an unlawful preference to the Batesburg bank, and rendered judgment in favor of the receiver for the $17,500 against the Batesburg bank. He also held that the amount due by the Columbia bank to the Batesburg bank was $42,950.76, made up aparently of the $25,450.-76 baalnce on general account, plus the $17,500 ordered returned. The item of $621.07 due by the Batesburg bank to the Columbia bank upon the special account appears to have been overlooked. It would reduce the debt of the Columbia bank to the Batesburg bank, to $42,329.69.

From this decree the Batesburg bank has appealed upon exceptions which practically present the two questions: First, is the Batesburg bank entitled to set off against its liability to the Columbia bank, upon the $50,000 deposit, the balance of $25,450.76 due by the Columbia bank to it? Second, is the receiver entitled to judgment against the Batesburg bank for the amount of the checks, $17,500, ordered by the bank examiner to be paid to it by the Richmond bank?

Before discussing these questions it may be proper to state that there were three accounts opened on the books of the Columbia bank with the Batesburg bank, with corresponding entires on the books of the latter; certain variations will be noted. The first of these accounts was marked, on the books of the Columbia bank, "First National Bank of Batesburg—Special Account"; the second, simply "First National Bank of Batesburg"; and the third, "First National Bank of Batesburg—State Matter." On the books of the Batesburg bank, the third account, instead of being marked "State Matter," was marked "Special Account"; no marks appear to have distinguished the other two accounts.

The Columbia bank was closed at some hour in the evening of June 25, 1926. It appears that it was open and doing business, up to 2 p. m., the usual closing hour, and that a meeting of the directors was held that evening. It may be assumed that at that meeting, the conclusion was reached to

close the doors of the bank, as on the morning of the 26th a notice was posted upon the bank's doors to that effect, and the bank was taken over by the state bank examiner on the same day.

Recurring to the three accounts above referred to, as they appeared upon the books of both banks, which were in accord: Upon the first account, it appeared that there was due by the Batesburg bank to the Columbia bank $621.07; on the second, that there was due by the Columbia bank to the Batesburg bank, $25,450.76; and on the third, that there was due by the Batesburg bank to the Columbia bank, $50,-000. So that, *according to the books,* the account on the whole stood thus:

The Batesburg bank, in account with the Columbia bank.

Dr.

To bal. on the first account .........$ 621.07
To bal. on the third account ...... 50,000.00

Cr.

By bal. on the second account ....          $25,450.76
    Debit amount to balance ......          25,170.31
                                           _____  _____
                                           $50,621.07  $50,621.07

This epitomizes the contention of the Batesburg bank.

If the contention of the state treasurer should be sustained as to the $50,000 deposit, and that of the Batesburg bank as to the $17,500 of checks should also be sustained, the account would stand thus:

Dr.

To bal. on the first account ......$   621.07

Cr.

By bal. on the third account ......          $25,450.76
    Credit amount to balance ....   24,829.69
                                           _____  _____
                                           $25,450.76  $25,450.76

If the contention of the state treasurer should be sustained as to the $50,000 deposit, and that of the receiver as to the $17,500 of checks should also be sustained, the account would stand thus:

Dr.

To bal. on the first account ......$    621.07

Cr.

By bal. on the third account ........            $25,450.76
By amt. of checks charged bank ....               17,500.00
        Credit amt. to balance ........42,329.69

                                    $42,950.76 $42,950.76

This epitomizes the joint contentions of the state treasurer and the receiver. (The matter of interest has not been included in the foregoing statement.) So that the two questions above indicated must be resolved in order to arrive at the proper statement of the account, as between the Columbia bank and the Batesburg bank, as to the liability of the Batesburg bank to the state treasurer, and as to the liability of the Batesburg bank to the receiver.

I. As to the first question: Is the Batesburg bank entitled to set off, against its liability upon the $50,000 deposit, the balance of $25,450.76 due by the Columbia bank to it? A negative answer to this question necessarily means an affirmance of the decree, in so far as it constitutes a judgment in favor of the state treasurer against the Batesburg bank for $50,000, with interest at 4 per cent. per annum from June 1, 1926.

There can be no doubt of the proposition that, if the $50,000 deposit represented a simple transaction, in which the Columbia bank deposited with the Batesburg bank money which had been deposited with it, the title which the Columbia bank had acquired to the money, upon the deposit with it, would have passed to the Batesburg bank, and its responsibility would have been limited to its depositor, the

Columbia bank. The facts will determine whether the transaction was of that simple character or not.

On the other hand, it is equally clear that, if the deposit was a special deposit, impressed with a trust in favor of the state treasurer, it would not be liable to the set-off claimed by the Batesburg bank.

It appears that in April, 1925, the State authorities determined to negotiate a loan of $5,000,000. The purpose and authority for entering into this transaction are not material to the present inquiry. In reply to a letter from the state treasurer, dated April 14, 1925, the Columbia bank, on April 22d, offered to make a loan to the State of $5,000,000, upon notes maturing at different dates, beginning January 6, 1926, and ending April 14, 1926, in varying amounts. They state in their offer:

"We will expect the funds arising from these notes to be deposited in the following banks, in amounts as indicated by us": (Here follows a list of a number of banks *including the Batesburg bank.*)

And add:

"The deposits in the various banks shall be secured * * * (by bond) in such amount as will protect the State against loss, in the event of defalcation, insolvency, or liquidation of said bank, or for any other cause, or surety (security?) for such deposit shall be furnished by the deposit of United States government bonds, or other securities approved by the State Finance Committee."

The proposition appears to have been quickly accepted, for on April 24, two days later, the Columbia bank transmitted to the state treasurer (then Mr. Carter), a check for $5,-000,000, and another for $13,029.90, premium paid by the Columbia bank. In the letter inclosing these checks were the following statements:

"We find that the group of banks *which we represent* will wish to deposit their securities and distribute the funds after the notes have been delivered. The Batesburg bank offers

Liberty bonds, and Land Bank bonds to the extent of $20,-000. * * * We would suggest that, after the transaction is closed, we submit for your consideration collateral from the following banks for your consideration:  [Here follows a list of eleven banks, including the Batesburg bank]. We ask that you hold the notes as security for the deposit, until we can submit other acceptable collateral therefor."

It seems that the matter of the deposit of the $5,000,-000 with the Columbia bank, though not alluded to at all in this letter, except in the last clause above quoted, was thoroughly understood, for it followed swiftly upon the heels of this letter.

The $5,000,000 check was deposited by the state treasurer with the Columbia bank, which opened a special account upon its books.

It thus appears that the deposit was made in conformity with the statements contained in the proposition of the Columbia bank, to be distributed by it among the banks designated, which would put up with the state treasurer, *not with the Columbia bank,* the necesary collateral as security. In other words the Columbia bank acted as an intermediary between the state treasurer and the banks which were clamoring for a part of the big deposit, and as a matter of convenience was to distribute the deposit among the banks which "we represent." The state treasurer, under normal conditions, would be held to have acted with great circumspection, for he had behind the deposit, not only the liability of the Columbia bank with its collateral, but the liability and collateral of each bank to which a part was distributed.  It seems impossible for the Columbia bank to escape, if it had any desire to do so, from the conclusion that it received the deposit as a special deposit, and was the trustee of an express trust.  That it was understood that the check would be immediately deposited with the Columbia bank; that it would be distributed among the banks "we represent"; and that the Batesburg bank was entirely familiar with the pro-

gram outlined is shown by the fact that on April 22d, two days before the check was transmitted to the state treasurer, and the day the offer was submitted, Unger, cashier of the Batesburg bank, had a conversation about the matter with Matthews, vice-president of the Columbia bank, and on April 23d, the day before the check was transmitted, Unger wrote Matthews:

"Referring to your conversation of yesterday (the 22d), *with reference to the state funds,* I find that we can very easily use the $200,000, in case you have that much that you want to place with us. [Plainly showing that he understood that the "state funds" were, as a matter of convenience, to be deposited with the Columbia bank, and distributed by it among the banks "we represent."] We have the Liberties and Joint Stock Land Bank bonds *to cover the $200,000 deposit.* We will expect the bonds to be released as the money is withdrawn. * * * We will write the Federal Reserve of Richmond, asking them to liquidate our bills payable, and, as soon as the form of receipt is received from the state treasurer, we will send copy to the Federal Reserve of New York *to be forwarded to the treasurer as security to these deposits."*

Prior to this, Unger had written to the state treasurer, on April 21st:

"If you have more money to deposit and wish to deposit with the First National Bank of Batesburg, we will be glad to put up additional Liberty bonds. * * * We have plenty of security for any amount that you may wish to put in, up to $200,000."

Then followed the conversation with Matthews on April 22d, unfolding the new plan, and Unger's letter of the 23d to Matthews, falling in line.

On the same day that Unger wrote to Matthews, the 23d, the day before the check was transmitted to the state treasurer, the 24th, and preparing for the plan outlined in that letter, Unger wrote to the state treasurer, asking for the treas-

urer's form of a receipt which he expected to send to the
New York bank to be signed by it and returned to the state
treasurer, releasing the collateral which the Batesburg bank
had up with the New York bank, and showing that the New
York bank held it for the state treasurer, "as security to these
deposits."    It seems that the Batesburg bank had certain
collateral, which it intended to use as "security to these de-
posits," with the New York bank, and expected, with the
money received of the state funds, to liquidate those notes;
the New York bank to still hold the collateral, but to ac-
knowledge by receipt, that it held it for the state treasurer as
security for the deposits obtained by the Batesburg bank.

On May 7th, the president of the Columbia bank wrote
Unger:

"In accordance with my telephone message, am inclosing
you herewith copy of form trust receipt which the state
treasurer desires that the holders of your collateral use in
receipting to him for *collateral held in trust.*   When this
trust receipt is received by the state treasurer, as I under-
stand it, *he is ready to release the funds to your account.*"

On the following day, May 8th, Unger wrote the New
York bank:

"We are sending you the form of letter (trust?) receipt
that we are asking you to make out and forward to the state
treasurer at Columbia, S. C., listing thereon the $50,000
of Joint Stock Land Bank bonds held by you for our ac-
count.   *These securities are being put up for deposits of
the State of S. C. which are to be made with us.*"

At the same time he mailed a copy of this letter to the
state treasurer, and wrote to the president of the Columbia
bank that he had written as stated.   In the latter he said:
"We can handle $200,000 of this money."   With the copy
sent to the state treasurer, he wrote a letter to him, dated
the same day, May 8th, stating:

"We are forwarding to you a copy of a letter that we
have written to Hanover National Bank, requesting them to

send you a receipt for $50,000 of First Carolinas Joint Stock Land Bank bonds, *which are to be held by them as security for deposit made by the state treasurer with this bank.* We will forward to you within a few days receipts for Liberty bonds *to secure deposits."*

On May 11th, the Hanover bank wrote to the state treasurer, acknowledging that it held the bonds referred to in the letter of the Batesburg bank, "for your account, to be held subject to your order."

On May 12th, Unger wrote the Columbia bank:

"* * * When the receipt for the * * * bonds is received by the state treasurer, *if you are holding the funds for him,* we ask that the money be deposited with the Federal Reserve Bank of New York, for our credit with the Federal Reserve Bank of Richmond."

On May 13th, the Columbia bank wrote to Unger:

"The state treasurer has received the trust receipt for $50,000 worth of collateral, so we are today remitting the Federal Reserve Bank, Richmond, for your credit $50,000."

The foregoing shows unmistakably that the Batesburg bank knew all along that the deposit made with it by the Columbia bank was funds of the state, distributed for convenience under an agreed plan by the banks, including itself, which were to receive a part of it. In addition to this overwhelming evidence, it appears that on January 2, 1926, the president of the Columbia bank advised the Batesburg bank that the first of the South Carolina notes would fall due on January 6th, and asking that $25,000 be transferred to its account "so that the same will be to our credit not later than January 5th." If this had not been understood by both parties to have been practically a state deposit, no transfer to the credit of the Columbia bank would have been necessary. This appeared necessary by reason of the fact that the deposit had been entered by the Batesburg bank upon its books as a "special account."

The Batesburg bank contends that the whole of the special deposit of $50,000 was returned by it to the Columbia bank, and that therefore the state treasurer has no claim upon it. The facts in this regard appear as follows:

The original deposit of $50,000 with the Batesburg bank was made on May 13, 1925; on January 6, 1926, the first of the state notes given to the Columbia bank was to fall due. In response to a letter from the Columbia bank to the Batesburg bank, dated January 2, 1926, giving notice of that fact and asking for a remittance of $25,000, the Batesburg bank remitted that amount, which reduced the deposit to $25,000; in the letter of January 2d, from the Columbia bank to the Batesburg bank, it was stated:

"If you will leave your collateral intact with the state treasurer it is very likely that we will have *other state funds* to deposit with you a little later on."

On January 23d, the Batesburg bank wrote to the Columbia bank.

"When the $25,000 was called on the 2d day of January, you asked us to leave those bonds with you, that at an early date you would have the money to replace. * * * We cannot leave these bonds up with the state treasurer in their present shape. You will therefore have to deposit money back with us by Wednesday of the coming week, or we will ask that these bonds be replaced, on security to state deposits, having the state treasurer to write Hanover National Bank advising that $25,000 of these bonds be released and are not longer to be held for the account as security for state deposits."

Accordingly on January 27th, the Columbia bank complied with the request of the Batesburg bank, by charging their general account with $25,000 and crediting the special account, "state matter," with that amount, making it subject to the checks of the Batesburg bank as the original deposit had been. The Batesburg bank was satisfied with this arrangement, the effect of which was to replace the $25,000

in the "state matter" account, secured by the collateral then in the state treasurer's hands restoring it to the orginal amount.

Later, on March 19th, the Columbia bank made another call for $25,000, which was honored on March 20th, reducing the original deposit to $25,000. In the letter of March 19th, the Columbia bank wrote as follows:

"You will kindly remit * * * *the balance of state funds which the state treasurer's office has on deposit with you through us; the same being $50,000.*"

By phone conversation the call was reduced to $25,000 which the Batesburg bank remitted without in the slightest degree questioning the foregoing statement, in effect acknowledging that it had on deposit $50,000 of the state's funds, secured by the collateral first put up. This remittance reduced the original deposit to $25,000. Later on April 3d and April 13th, the Columbia bank restored the deposit to the original amount, $50,000, by deposits on those days of $12,500 each.

It is plain, we think, that the parties, by these variations in the original deposit account, intended it to be restored to the original amount and to continue to be secured by the deposit of collateral which the Batesburg bank had originally made with the state treasurer.

It is unusual that a judgment should be rendered in behalf of a defendant against his codefendant, where the defendant makes no demand for such judgment and has served no copy of his answer upon his codefendant. As no objection has been made to this proceeding by the exceptions which in fact do not, except indirectly, bring the judgment in question, we can only pass by the objection suggested.

We are of opinion that the state treasurer has the right to hold the collateral in his hands as security for the payment of the $50,000 deposit, and that the Batesburg bank has not the right to set off against its liability upon the $50,000 deposit, its claim against the Columbia bank.

II. As to the second question: Is the receiver entitled to judgment against the Batesburg bank for the amount of the checks, $17,500 ordered by the bank examiner to be paid to it by the Richmond bank?

It appears that on June 23d the Batesburg bank had to its credit with the Columbia bank, upon general account, a considerable amount; that on that day, at the request of the Batesburg bank, the Columbia bank remitted to the Federal Reserve Bank of Richmond its check for $10,000, on the American National Bank of Richmond, to be placed to the credit of the Batesburg bank, and on June 24th, a similar check for $7,500. At that time the Columbia bank had sufficient funds on deposit with the Richmond bank to meet these checks. The checks, however did not reach the Federal Reserve Bank in Richmond until the morning of June 26th, and when presented to the drawee bank, the American National Bank of Richmond, payment was declined for the reason that the Columbia bank had at that time been taken over by the state bank examiner. Subsequently the bank examiner became convinced of the validity of th claim of the Batesburg bank, and on July 7th directed the Richmond bank to pay the checks to the Batesburg bank, which was done. The receiver now seeks to recover the amount of these two checks, $17,500, from the Batesburg bank.

It matters not that the checks were not presented and paid by reason of the delay of the Columbia bank in forwarding them to the Federal Reserve Bank; the fact remains that they were not presented until after the bank examiner took over the Columbia bank, and, when he did so, he was authorized "to take and retain sole possession and control of the property and business and may obtain an order authorizing the corporation to liquidate its affairs under his supervision. Liquidate under this statute means to gather in the assets, convert them into cash and distribute them according to the legal rights of the parties interested." *Browne v. Hammett,* 133 S. C., 446; 131 S. E., 612.

As the checks did not operate as assignments of any part of the fund on deposit with the Richmond bank to the credit of the Columbia bank (3 Code of 1922, § 3840), it follows that the fund on deposit immediately went, constructively, into the possession of the bank examiner; the corporation had no further control over it. "After the [bank] examiner * * * took over the 'sole possession and control of the property and business of such corporation for not exceeding 30 days,' all corporate activities of the corporation were suspended, unless and until during that period the corporation determined to 'resume business.'" *Browne v. Hammett,* 133 S. C., 446; 131 S. E., 612.

It became the duty then of the bank examiner to collect and conserve all of the assets of the bank, including this deposit in the Richmond bank, for the equal and *pro rata* benefit of the creditors. He had no right to dispose of any of them upon any other basis. In fact, under Section 3981, Vol. 3, Code of 1922, during the period of 30 days, the bank examiner has no authority to dispose of any of the assets of the bank; with his consent the Court may order a liquidation of the corporation, under the sole supervision and control of the examiner, subject to the orders of the Court, or the bank may be permitted to resume business; or, under Section 3985, in case of the insolvency of the bank, the examiner may apply to the Court for a receivership "to wind up and settle the affairs of such bank or banking institution."

The bank examiner had less authority in reference to assets, than a receiver would have had. It is generally held that, under the circumstances above detailed, the holder of the check is without right of preference over other creditors, and of course the receiver would have no right to recognize his claim to preference. *Clark v. Toronto Bank* (Kan.), 2 L. R. A. (N. S.), 83. See extended note to this case and many authorities cited in the reported case, 72 Kan., 1; 82 P., 582; *Clark v. Chicago*

*Title & Trust Co.,* 186 Ill., 440; 57 N. E., 1061; 53 L. R. A., 232; 78 Am. St. Rep., 294; 7 C. J., 751.

The Batesburg bank contends that it was induced by notice from the Columbia bank, that the checks had been forwarded as requested, to make other deposits with the Columbia bank upon faith of those remittances. It appears that, after the Columbia bank had notified the Batesburg bank that the checks had been remitted as requested, the Batesburg bank forwarded to the Columbia bank a draft with bill of lading attached for $11,185 upon a party in Augusta, for collection; that the Columbia bank sent it to an Augusta bank, which collected the draft and placed the proceeds to the credit of the Columbia bank, which passed them to the credit of the Batesburg bank; that other items amounting to $9,238.49 were forwarded, which were treated in the same manner. Evidently these collections were forwarded in the usual course of dealing between the two banks, and were not at all induced by the transactions of the two checks.

This is a hard case upon the Batesburg bank, but the time has not arrived yet when a bank failure has not hurt, and hurt badly, scores of person who dealt with it in confidence of its strength.

The judgment of this Court is that the decree of the Circuit Court be affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE BLEASE disqualified.